**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

CAROL A. KILLINS                                                                          PLAINTIFF

v.                                        No. 4:06CV00828 JLH

SOCIAL SECURITY ADMINISTRATION                                            DEFENDANT

## OPINION

Carol A. Killins has appealed the final decision of the Commissioner of the Social Security

Administration denying her claim for disability insurance benefits and supplemental security income

payments.  The parties have submitted their appeal briefs, and the issues are now joined and ready

for decision.

## I.

Killins has the burden of proving her disability by establishing a physical or mental

impairment lasting at least one year that prevents her from engaging in any substantial gainful

activity.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Baker v. Apfel*, 159 F.3d 1140, 1143 (8th Cir.

1998); *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997).  The Commissioner has found that she

is not disabled.  The Court's function on review is to determine whether the Commissioner's

findings are supported by substantial evidence on the record as a whole.

> Substantial evidence is less than a preponderance, but is enough that a reasonable
> mind would find it adequate to support the Commissioner's conclusion. In
> determining whether existing evidence is substantial, we consider evidence that
> detracts from the Commissioner's decision as well as evidence that supports it. As
> long as substantial evidence in the record supports the Commissioner's decision, we
> may not reverse it because substantial evidence exists in the record that would have
> supported a contrary outcome, or because we would have decided the case
> differently.

*Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

## II.

Killins filed her application for disability insurance benefits and supplemental security income payments on October 19, 2004, alleging that she became disabled on September 16, 2004, due to degenerative disc disease, osteoarthritis in her hips, back,  and knees, and diabetes including blurred vision (Tr. 14, 109-110, 271).  Her claims were denied initially and upon reconsideration. Pursuant to Killins's request, a  hearing was conducted by the administrative law judge on January 4, 2006 (Tr. 258).  Also present and testifying was David O'Neal, a vocational expert.  Killins, through her counsel, amended her alleged onset date to October 11, 2004, based on the testimony that she gave at the January 4, 2006 hearing (Tr. 270).

Killins was born on October 16, 1960, and was 45 years old when the ALJ decided her case in January 2006 (Tr. 14, 260-261).  She has a high school education and has past relevant work experience as an armed security guard, a school bus driver, and a line worker at a frozen food plant (Tr. 14).

Killins's last employment was with the Hector School District as a school bus driver in early 2004 (Tr. 73).  She testified that she quit driving the school bus because her vision was so badly blurred that she was afraid to drive the children and because she passed out in December of 2003, after which she was checked for diabetes and found to be glucose intolerant.  She does not take medication for the condition (Tr. 264-265).  When asked by the ALJ if she had had her eyes checked by an ophthalmologist, Killins said that she had and that her eyes were pretty normal for her age but that she had blurred vision daily and related dizziness about three times per week (Tr. 264, 279).  She also testified that carrying her eight-pound M-16 on a regular basis at her security job with Wackenhut at Arkansas Nuclear One, where she was employed in 2000, would send her home crying

2

(Tr. 262-263, 267).  In the Function Report that she completed on November 12, 2004, Killins wrote that she had "some sugar problems that makes me have real bad blurred vision at times which makes me afraid to drive sometimes."  (Tr. 81).  She stated in her Disability Report - Appeal for July 29, 2005, that "[t]he diabetes or glucose intolerance causes me to have problems seeing.  Some times I have blurred vision."  (Tr. 110).  At the hearing, she testified that she watches what she eats, that she monitors her blood sugar, and that her blood sugar is pretty much under control (Tr. 280).

Killins testified that her problems at the time of the hearing were pain from bursitis in her hip, arthritis in her back, and right tennis elbow and swelling in her right ankle if she stands on it too much (Tr. 271).  She stated that she takes Tramadol to help control the pain, but she gets the same pain killer out of Tylenol without the side effects (Tr. 274-275).  Killins testified that she takes Trazodone on the average of twice per week when she cannot sleep but that she usually does not have a problem falling asleep.  Her problem is tossing and turning, and getting up and down to go to the bathroom (Tr. 275, 278).  In her Disability Report - Appeal for January 4, April 5, and July 29, 2005, Killins stated this medicine was prescribed as a sleep aid (Tr. 88, 95, 114).  The January 3, 2006, pre-hearing memorandum prepared by Killins's counsel also lists the reason for this medicine as a sleep aid (Tr. 120).  She continued that she takes a medication for water retention on an average of twice a week for swelling in her feet, legs, hips, and hands (Tr. 276).

Killins further testified that, although she had not been diagnosed for depression and had never rescheduled a cancelled appointment to see her Advanced Practice Nurse (APN) about depression, she thought that she has depression because she wants to cry all the time, is irritable with people and feels like "crud" some afternoons (Tr. 277).  She described a typical morning as crawling out of bed after she had woken up from hurting in the middle of the night, alternating between the

coffee pot and the couch in the morning for an hour to get rid of stiffness, doing a load of laundry and dishes between sitting down someplace "cushy" and later taking a nap or a hot bath (Tr. 278). Killins also testified that she had had ongoing problems with her kidneys and diverticulitis for three or four months straight but that she was not having any symptoms of either at the time of the hearing (Tr. 280-281).

## III.

The ALJ undertook the familiar five-step analysis in determining whether Killins was disabled.  The five-step sequential evaluation determines: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe and medically determinable physical or mental impairment; (3) whether the claimant may be deemed disabled because the impairment meets or equals a listed impairment in Appendix 1 to Subpart P, Title 20, Code of Federal Regulations; (4) whether the claimant is able to return to past relevant work, despite the impairment; and if not (5) whether the claimant can perform any other kind of work.  20 C.F.R. §§ 416.920 and 404.1520.  *See Cox v. Barnhart*, 345 F.3d 606, 608 n.1 (8th Cir. 2003).

The ALJ found that Killins had not engaged in substantial gainful activity since the alleged onset of disability (Tr. 14).  The ALJ further found that Killins suffers with degenerative disc disease of the thoracic spine and trochanteric bursitis, as well as tennis elbow but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 15).   He also found that her alleged blurred vision, diabetes mellitus, and depression were not medically determinable from the record (Tr. 20).

The ALJ evaluated Killins's subjective allegations and complaints pursuant to the criteria set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  He found that, while Killins has a

condition that results in pain and limitations, it does not limit her to the extent that she alleges (Tr. 19). The ALJ found that Killins can lift and carry 10 pounds occasionally and 5 pounds frequently; stand, walk or both up to 2 hours in an 8 hour workday; sit up to 6 hours in an 8 hour workday; and occasionally stoop, squat, crouch, crawl and climb stairs (Tr. 21, 23). He thus found that Killins had the residual functional capacity to perform sedentary work-related activities. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a). The ALJ further found, based on the testimony of the vocational expert, that Killins cannot perform any of her past relevant work. He held, therefore, that the burden shifted to the Commissioner to show that Killins could perform other jobs that exist in significant numbers in the national economy (Tr. 21). The ALJ asked the vocational expert whether jobs exist in the national economy for an individual of Killins's age, education, past relevant work experience, and residual functional capacity as stated in a hypothetical (Tr. 286). The vocational expert testified that there were sedentary, unskilled jobs that exist in significant numbers in the national economy that Killins could perform, such as a cashier, an interviewer and a delivery driver (Tr. 286-287). Based on the vocational expert's testimony, the ALJ found Killins not to be disabled (Tr. 22, 24).

Killins requested review of the ALJ's decision (Tr.9). The Appeals Council denied her request for review on June 14, 2006 (Tr. 3-5). Killins then filed this action pursuant to 42 U.S.C. §405(g).

## IV.

Killins contends that the ALJ erred in failing to develop the evidence because he made no attempt to obtain a residual functional capacity from any treating physician and did not request a mental evaluation; he failed to consider evidence which fairly detracted from his findings by ignoring problems with her hands and arms, side effects to medication, problems with pain in her back and hips as well as joint pain in general, recurring kidney stones, stomach problems and glucose intolerance, dizziness and blurred vision, and severe fatigue and insomnia; he failed to apply proper legal standards in assessing credibility of her subjective complaints in not recognizing all her impairments, treatments, and daily activities; he assigned weight to medical opinions by non-treating, non-examining doctors; and he determined Killins's residual functional capacity without including all of her limitations.  She further asserts that the ALJ erred in relying on vocational expert testimony to meet the burden at the fifth step when the hypothetical question was flawed since it did not include all of Killins's impairments supported by the record and in denying benefits based on the framework of the Medical Vocational Guidelines (Grids).

The evidence was fully developed by means of the medical records that were obtained and reviewed by the ALJ and the testimony received at the hearing.  Killins has a history of a rash with swelling and joint pain as a possible allergic reaction or sign of lupus; broken ankle with surgery; sinus infections; kidney stone; benign breast mass; reproductive organ problems including a hysterectomy; glucose intolerance; positive screening for ANA;[1] thoracic, sacral, musculoskeletal and joint pain for tennis elbow, bursitis, and presumed degenerative joint disease; and diverticulitis.

---

[1]Antinuclear Antibody test.

She has complained of gastrointestinal symptoms on more than one occasion and was found to have peptic ulcer disease in 2004.

Carol Townsend, APN, saw Killins on March 27, 2001, with some mid thoracic pain and mild discomfort of the lower sacral area (Tr. 185).  It was noted that Killins has a documented history of some lumbar lordosis and some mild scoliosis.  The examination of the spine revealed that Killins had a curvature in the thoracic area with considerable lordosis of the lower spine and a fair amount of tenderness with some mild muscular spasms mid thoracic area.  The x-ray showed some mild curvature of thoracic area as well as lumbar area and some degenerative changes in the thoracic area as well. Killins's next visit was on September 13, 2001, with intermittent right-sided abdominal pain.

The December 22, 2003, record by Townsend shows that Killins has glucose intolerance which Townsend wanted Killins to treat with diet and exercise before starting any medication (Tr. 136).  On May 20, 2004, Killins received laboratory work on her glucose intolerance; the record contains the notation that Killins was notified of the lab results on May 24, 2004, but there is no notation of those results (Tr. 134).

On September 3, 2004, Melissa Darnell, APN, reported that Killins had joint pain that had worsened over the last couple of weeks in her knees and left hip and that the examination revealed no obvious deformity, no crepitus, no swelling, no erythema and no actual additional pain to palpation (Tr. 133).  At the follow-up visit on September 9, 2004, Townsend reported that the laboratory testing revealed that Killins had a positive ANA, noted that Killins has to do a lot of walking up and down stairs at work which has bothered her hips and knees, and referred Killins to Dr. Deneke regarding her musculoskeletal discomfort and positive ANA (Tr. 131).  At a second

follow-up visit on September 20, 2004, Townsend recorded that Killins had been experiencing insomnia for some time and was given a trial of Trazadone (Tr. 130).

Dr. James Deneke, Cooper Clinic Department of Rheumatology, examined Killins on October 11, 2004.  Killins's "History of Present Illness"was recorded as:

> A 43 year old white female in probably 1990 developed pain in her hands followed by rash and swelling.  She has had it intermittently for the last three years.  She has hurt in various joints over the last three year.  Usually somewhere she is hurting.  At times her jaws pop.  She has occasional stiffness, occasional pain o[n] motion of the neck.  She has occasional pain in the shoulder blades.  This pain worsens when she is carrying things.  The elbows hurt to use them.  The right wrist may hurt with increased use.  She has occasional decreased bending of the fourth and fifth fingers of the right hand, the second and third fingers occasionally numb.  She has occasional pain with use, more so on the right hand than the left.  She has discomfort in the knees going up and down steps.  She has discomfort in the side of her hip with stairs.  Her right ankle occasionally hurts.  She has the pain in her right wrist that occasionally will go up the arm.  She describes three or four hours of morning stiffness while denying rash, photosensitivity, subcutaneous nodules, sicca, iritis, hair loss or Raynaud's.  She has had trouble getting to sleep maybe three years.

Dr. Deneke also noted that Killins complained of frequent diarrhea.  Dr. Deneke's assessment was: positive ANA without clear cut signs of connective tissue disease; right tennis elbow; trochanteric bursitis; presumed degenerative disease of the spine, seemingly aggravated by her work; history of kidney stone; and history of glucose intolerance (Tr. 146).  He recommended  re-evaluation if new symptoms developed; instruction in stretches for tennis elbow and trochanteric bursitis; possible referral to physical therapy if increased or persistent problems with the hip occurred, as well as injection of the elbow or hip if problems worsen; trial of Salsalate; heat, ice and Tylenol; and "may well need job change since being on her feet, going up and down stairs seems to bother her hips and carrying the M-16 bothers her upper back" (Tr. 147).  Dr. Deneke did not schedule a follow-up.  He

stated that "[a]t present I really don't think we are seeing connective tissue disease, but certainly I cannot completely rule that out."[2]

In an October 28, 2004, letter to Killins (Tr. 252), Dr. Deneke stated that her ANA test for multiple connective tissue disease was "not significantly positively." He continued that he had forwarded his reports to Ms. Townsend and told her that he did feel that Killins had evidence of trochanteric bursitis as well as tennis elbow.

Killins saw Dr. Lyons at the Morrilton Medical Clinic on May 31, 2005, with back discomfort, nausea and urinary changes and was treated for a urinary tract infection (Tr. 243). She was seen again by Dr. Lyons on July 25 and August 9, 2005, and treated for diverticulitis (Tr. 243).

The ALJ did not err by failing to develop the record because there was sufficient information in the record for the ALJ to make an informed decision. In *Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989), the court stated:

> The ALJ found that Matthews suffered from mild situational depression but that this impairment was not severe enough to preclude her from working. Matthews asserts that the ALJ erred in assessing the severity of her psychological impairment without any evidence to support this finding and that the Secretary should have ordered a consultative psychiatric examination. The regulations, however, do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment. They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination. 20 C.F.R. § 416.917(a); *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986) (*per curiam*); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 214 (6th Cir. 1986).

*See also Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001).

The Commissioner has correctly pointed out that Killins has never been diagnosed with depression and she has not claimed that her symptoms interfered with her ability to perform work-

---

[2] Neither Dr. Deneke nor any other doctor Killins has seen mentioned in the medical records the possibility that she might have Celiac Disease or some other auto-immune disorder.

related activities. Killins denied any depression to Dr. Deneke on October 11, 2004, and she did not reschedule her cancelled appointment with Ms. Townsend. The record repeatedly refers to Trazadone as being a sleep aid for Killins, not an anti-depressant. "The mere fact that [plaintiff] has been prescribed antidepressants on at least one occasion is not enough to require the ALJ to inquire further into the condition by ordering a psychological evaluation." *Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003) (citation omitted).

The ALJ considered all of Killins's medical problems but concluded, properly, that Killins should be able to do sedentary work. The only medical provider who mentioned work restrictions was Dr. Deneke, who said, "May well need a job change since being on her feet, going up and down stairs seems to bother her hips and carrying the M-16 bothers her upper back." He did not propose any further limitations. The record does not reflect any other health provider noting or proposing any restrictions on Killins.

The ALJ's opinion took note of the medical records regarding complaints as to Killins's hands and arms, side effects to medication, problems with pain in her back and hips as well as joint pain in general, recurring kidney stones, stomach problems and glucose intolerance, dizziness and blurred vision, and fatigue and insomnia. However, the ALJ did not believe that Killins is as limited in her capacity as she claimed. In assessing credibility, an ALJ should consider the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322. Here, the ALJ wrote:

Further review of the file reveals the claimant has reported fairly restrictive daily activities associated with chronic pain. Nevertheless, she reported that she cares for her own personal needs, prepares light meals, drives her car, and performs light household chores.

* * *

After giving due consideration to credibility, motivation, and the medical evidence, the Administrative Law Judge is persuaded that while this claimant most certainly has a condition that results in pain and limitations, it is not to the extent that she alleges. The undersigned first notes there are significant gaps in the claimant's treatment history. She first reported joint pain on September 3, 2004 and laboratory values revealed a positive ANA. She was referred to a rheumatologist, Dr. Deneke, who upon physical examination of the claimant found she demonstrated good range of motion without pain or swelling in her all [sic] of her joints and only a little tenderness in her right elbow, left hip as well as some tenderness and pain on motion with extension and flexion of her back in the thoracolumbar junction. Blood work taken on the date of that visit was normal with the exception of ANA, which Dr. Deneke reported was not significantly positive. Dr. Deneke reported that claimant had evidence of trochanteric bursitis as well as tennis elbow, along with a positive ANA without clear cut signs of connective tissue disease. He further presumed she had degenerative disease of the spine, which was aggravated by her current work and stated that she might well need a job change since being on her feet and going up and down stairs seems to bother her hips, and carrying the M-16 rifle bothers her upper back. He also advised the claimant that if Salsalate did not offer her any relief, she might want to consider physical therapy. Dr. Deneke did not schedule any follow-up with the claimant and according to the records; she did not see him after that date of October 11, 2004 nor are there any references that the claimant expressed the desire to try physical therapy for pain relief, since she has reported no improvement with her symptoms from the Salsalate.

According to the records submitted, the claimant has not sought any additional medical treatment for joint complaints and the treatment that she has sought has been for general routine medical care, such as urinary tract infections and pyelonephritis. Secondly, the undersigned notes the claimant takes no ongoing medications. It is noted on September 3, 2004, Ms. Darnell gave the claimant samples of Ultracet to be used for acute pain, and the claimant reported on her next visit that the medication had helped somewhat with her discomfort. On September 20, 2004, Ms. Townsend supplied the claimant a trial of Trazodone to help with her insomnia. Dr. Deneke prescribed Salsalate for the claimant, which she stated did not help. It is apparent from the record these are the only occasions the claimant was given medication for her purported pain symptoms and there is no evidence that she ever requested refills or a change of medication. This is confirmed by Ms. Killins herself, when she reported on May 31, 2005, to Dr. Lyons that she takes no medications regularly.

Thirdly, the undersigned notes the claimant's physicians and consulting physicians have not placed any restrictions on her activities other than to suggest she might need a job change that did not involve being on her feet, carrying the rifle on her upper back, and going up and down stairs.

The claimant's alleged blurred vision, diabetes mellitus, and depression are not medically determinable from the record. The record shows Ms. Killins had an eye examination on May 14, 2004, which was within normal limits. No complaints were made on that visit to her eye doctor that she experienced blurred vision or dizziness. Likewise, a search of her treatment records substantiate that she has never made the complaint of dizziness or blurred vision to her treating physician. The record does support Ms. Killins complaint of an episode of weakness and fatigue while driving the school bus; which resulted in the finding that she was glucose intolerance [sic]; however, no further complaints are mentioned. At the time it was determined she had experienced an episode of low blood sugar, the claimant reported she was going to diet and start an exercise program. The record is apparent that she was quite successful with this goal, because later records confirm the claimant had a substantial weight loss and blood work done at Dr. Deneke's office on October 11, 2004, show the claimant's glucose level was 95. Furthermore, she is not on any medication to control either high or low blood sugars.

With regard to her allegations of depression, when claimant was evaluated by Dr. Deneke on October 11, 2004, she denied nervousness, depression, or memory loss and when she completed a medical history form for Dr. Lyons on May 31, 2005, she reported she felt anxious, depressed, or irritable "once in a while." She is not on any anti-depressive medication and she has not made any complaints to her treating physicians that she is depressed or would like to be referred for mental health services. Likewise, none of her physicians have ever suggested that she need this service. When the claimant completed the "Function Report" at the time she filed for disability, she listed no limitations in her daily functioning due to mental disorders. She reported she shops, drives, goes outside everyday, handles a savings account and checking account, attends church regularly, and attends to her self-care and light household chores.

The ALJ properly set out his reasons in supporting his credibility findings. The Court notes that only once did testing find glucose intolerance, and the record is devoid of complaints by Killins to medical providers thereafter of dizziness or blurred vision, even when she saw the ophthalmologist months after the one reported episode and subsequent testing.

12

The ALJ properly relied upon Dr. Deneke's examination report.  His report does not conflict with the other medical records.  Although the ALJ cited the opinions of the State Agency medical consultants as further support for his conclusion that Killins is not disabled, he did not improperly give their opinions controlling weight.

Killins's argument that the hypothetical question was flawed by not listing all of her limitations is inaccurate.  The hypothetical question submitted to the vocational expert was consistent with the finding by the ALJ that Killins has the residual functional capacity for sedentary work with the additional restrictions that she should only occasionally stoop, squat, crouch, crawl and climb stairs.  The answer to a properly phrased hypothetical question, as posed by the ALJ here, constitutes substantial evidence.  *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

## CONCLUSION

Substantial evidence on the record as a whole supports the Commissioner's decision that Killins was not disabled.  Accordingly, the Commissioner's administrative decision is hereby AFFIRMED.

IT IS SO ORDERED this 5th day of July, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

13